*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0212a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

SHAN SHENG ZHAO,

*Petitioner,*

No. 07-4117

*v.*

ERIC H. HOLDER, JR.,

*Respondent.*

On Appeal from the Board
of Immigration Appeals.
No. A76 513 761.

Submitted: October 28, 2008

Decided and Filed: June 16, 2009

Before: MARTIN and GILMAN, Circuit Judges; DOWD, Senior District Judge.[*]

_____

**COUNSEL**

**ON BRIEF:** Oleh Roman Tustaniwsky, LAW OFFICES, New York, New York, for
Petitioner. John W. Blakeley, Aviva L. Poczter, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Respondent.

_____

**AMENDED OPINION**

_____

DOWD, Senior District Judge. Shan Sheng Zhao (Zhao) seeks review of the
Board of Immigration Appeals' (BIA) decision denying his applications for withholding
of removal for fear of persecution pursuant to section 241(b)(3)(B) of the Immigration

_____

[*] The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District
of Ohio, sitting by designation.

and Nationality Act (the Act or the INA), 8 U.S.C. § 1231(b)(3)(A),[1] and for withholding of removal for fear of torture pursuant to Article 3 of the Convention Against Torture (CAT).[2] Zhao argues that the BIA erred by: (1) adopting and affirming the Immigration Judge's (IJ) finding that Zhao was not credible; and (2) denying Zhao's applications for withholding of removal under the Act and the CAT. For the following reasons, we affirm the decision of the BIA.

## I. BACKGROUND

Zhao, a citizen of the People's Republic of China, illegally entered the United States in February 1995. On January 31, 2003, almost eight years after Zhao's arrival, the Department of Homeland Security initiated proceedings against Zhao to remove him to his native China, citing the violation of 8 U.S.C. § 1182(a)(6)(A)(i), which requires aliens entering the United States to be admitted or paroled. An alien who is present in the United States without being properly admitted or paroled is inadmissible as a citizen.

On February 18, 2005, Zhao filed an application for withholding of removal under 8 U.S.C. § 1231(b)(3)(A). This provision prohibits the Attorney General from removing an alien if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion. *See Ka v. Gonzales*, 236 F. App'x 189, 191 (6th Cir. 2007). Zhao's application for withholding of removal under 8 U.S.C. § 1231(b)(3)(A) was based specifically on a fear of persecution arising from

---

[1]The Immigration and Nationality Act of 1952 (the Act or the INA) is codified in Title 8 of the United States Code. Withholding of removal is set forth in section 241(b)(3)(B) of the Act.

[2]The CAT is a United Nations treaty signed by many nations in 1985 in "recognition of the equal and inalienable rights of all members of the human family." The Foreign Affairs Reform and Restructuring Act, enacted by Congress in 1998 (FARRA), contains a provision that executes Article 3 of the CAT. Both Article 3 of the CAT and withholding of removal under section 241(b)(3)(B) of the Act are addressed in Section 1208.16 of Title 8 of the Code of Federal Regulations (C.F.R.): "Withholding of removal under section 241(b)(3)(B) of the Act and withholding of removal under the Convention Against Torture." Under 8 C.F.R. § 1208.16(b), the applicant bears the burden of proof that he is eligible for withholding of removal under section 241(b)(3)(B) of the Act. Under 8 C.F.R. § 1208.16(c), "Eligibility for withholding of removal under the Convention Against Torture," the applicant bears the burden of proof to establish that he would be tortured if removed to the proposed country of removal. Both sections establish specific guidelines for evaluating the application, including an assessment of the applicant's credibility.

his opposition to China's coercive family planning policies after his wife's forced abortion.[3]

Zhao also applied for withholding under the CAT.  *See* 8 C.F.R. § 1208.16(c).  According to this provision, an applicant is eligible for withholding of removal if he can show it is more likely than not that he would be tortured if removed to the proposed country of removal.  Zhao claimed fear of torture based on "the same explanation in question one" (his opposition to his wife's forced abortion).

 A. Summary of Zhao's Application for Withholding under the Act and the CAT

According to Zhao, his wife, Qing Yang, was born on October 22, 1975.  They met when they were seventeen years old and fell in love.  He describes having a traditional marriage on July 15, 1993 (without civil registration) with the consent of his father.  His wife became pregnant five months later, in December of that year.  Zhao stated that, according to "previous China family planning policy," you have to be twenty-five or older to have a baby, and they were not old enough to obtain birth permission.[4]  In "early February 1994," the "government's officer knows (*sic*) this news.

---

[3]Two remedies are available to applicants claiming fear of persecution if returned to their native countries: asylum and withholding of removal.  If the alien applies within a year, he may seek asylum.  In his application, Zhao claimed that his attorney had applied for asylum within a year of his arrival, but "they could not find my file."  Ultimately, his attorney conceded at his removal hearing that Zhao was not eligible for asylum and in his appellate brief conceded likewise that this Court could not review any claim for asylum as both the IJ and the BIA denied the claim as time-barred.  Therefore, the only remedy available to Zhao for a claimed fear of persecution is withholding of removal.

[4]The Court's research revealed mixed results.  According to Article Six of the Marriage Law of the People's Republic of China, "In order to get married, the man shall not be younger than 22 years old and the woman shall not be younger than 20.  Late marriage and late child birth shall be encouraged." (From "Marriage Law of the People's Republic of China," *available at* http://www.helplinelaw.com/law/china/marriage/mlaw.php).  The Court's research also revealed that couples must obtain a marriage permit before they can obtain a birth permit. "Early marriage" occurs when a woman under 20 years old marries a man less than 22 years old.  If the government finds out that the wife is pregnant, it will fine the couple 10,000 Yuan and immediately ask for abortion and sterilization. (*Forced Abortion and Sterilization in China: The View from the Inside: Hearing Before the Subcomm. on International Operations and Human Rights of the Comm. on International Relations*, 105th Cong. 29 (1998) (paraphrased testimony of Harry Hongda Wu, Executive Director, Laogai Research Foundation) *available at* http://commdocs.house.gov/committees/intlrel/hfa49740.000/hfa49740_0f.htm).

 However, according to an article in the British newspaper "The Independent," the actual marriage age may be older in some places.  "With the marriage age in urban areas set around 25 years old, the first generation of 'one-child' couples is starting to emerge." (Lorein Holland, *China Birth Rate Hit By Dragons,* The Independent, February 1, 2000 at http://www.independent.co.uk/news/world/asia/china-birth-rate-hit-by-dragons-724693.html).

They come to my house to take my wife away. We had a big fight. I tried to stop them to touch my wife, so they pushed and hit me." Zhao continues by saying he could not stop them from taking his wife to the local hospital where "she was forced to take an abortion." He reports that he was detained in the police department for a month because he did not agree with the action the Chinese government took against his wife forcing her to have the abortion. He was fined 2000 RMB for release.[5]

Zhao describes that his wife was depressed for a long time after she lost her baby and wanted to stay with her mother. Zhao felt "helpless, hopeless and angry." He recounts further that, one day, when he was walking down the street he "happened to see the officer" who took his wife away. He describes that, "I was thinking about my baby and my poor wife and I can't help myself . . . I caught the officer and hit him a couple of times and run (*sic*) away." He states that he then went to his mother-in-law's house to see his wife and right after he arrived, his "dad called" and told him that "the police officer came to my house to try to arrest me, so my father told me don't come back, run as far as possible." Since then, Zhao reports on his application, "we are in government's 'not decent citizen list.' We had no future in China. I was running around in my relatives' houses for about (*sic*) year." Zhao describes that he then "found a snakehead through a friend of mine" and left his country in February 1994.[6] He reports entering the United States (Los Angeles) in February 1995 without his wife. Zhao's application concludes that if he returned to China, he fears he would be tortured, harmed or mistreated, specifically, by being jailed by the Chinese government.

B.    Summary of Zhao's Testimony at his Removal Hearing

Zhao's removal hearing occurred on March 9, 2006, thirteen months after completing the application. Zhao's testimony was inconsistent with his application on several key points.

---

[5]RMB is the abbreviation for "Ren Min Bi," or Yuan; approximately U.S. $285.00.

[6]A "snakehead," in criminal slang terms, is a human smuggler. Federal Bureau of Investigation, *The Case of The Snakehead Queen; Chinese Human Smuggler Gets 35 Years*, FBI Headline Archives (March 17, 2006), *available at* http://www.fbi.gov/page2/march06/sisterping031706.htm.

First, he testified that the individuals from the "family planning" center came for his wife to force her to have the abortion on *December 23, 1993.* Second, Zhao testified that when he encountered the "family planning" official on the street he "*hit him once and my friend push me away, take me away.*" Third, he testified that a *female cousin* called him at his mother-in-law's house to warn him that police had come to arrest him. Fourth, he testified that in the year between the February 1994 confrontation with the officer when he "left home" and February 1995 when he came to the United States, he went to Guangzhou and Shenzhen. He testified that he had stayed with friends in those cities, and had *no relatives* in Hong Kong or Singapore. He then testified that he came to the U.S. from *Hong Kong* where he had been "sightseeing," but later testified that he came to the U.S. from *Singapore*. Fifth, Zhao failed to testify on direct or cross-examination that he was put on a "not decent citizen list" as stated on his application.

Additionally, Zhao testified that since coming to the United States he married a woman who was in the process of obtaining her "green card." At the hearing, he told the IJ that this woman was three months pregnant.

Zhao provided no corroborating evidence at the hearing. Zhao testified that he sent an affidavit from his father to his attorney long ago, but at the hearing only provided a letter, untranslated from his native Chinese, to the IJ. He also testified that he did not obtain an affidavit from his cousin because "it did not get to my mind at that time." He had no proof of his marriage in China or of the abortion.

C.     Findings of the Immigration Judge

In her findings and conclusions, the Immigration Judge explained in great detail the role of the IJ in the credibility determination, the importance of credibility to the applicant's burden of proof, and her analysis of the evidence before her.

The IJ elaborated that the credibility of the respondent was of extreme importance in assessing his clams for relief and protection. Citing *In re O-D-*, 21 I&N Dec. 1079 (BIA 1998), she stated, "Before determining whether the applicant meets the statutory criteria required for withholding of removal under the [Immigration and

Naturalization] Act and withholding under the Convention Against Torture, this Court must make a threshold determination of the alien's credibility." Citing *In re Dass*, 20 I&N Dec. 120, 124 (BIA 1989), she explained that the applicant's testimony could be sufficient as the sole evidence in support of a claim for relief and protection where it was "believable, consistent and sufficiently detailed in light of general conditions in the home country to provide a plausible and coherent account of the basis of the alleged fear." Although the lack of corroborating evidence is not necessarily fatal, the IJ explained, quoting *In re B-B-,* 22 I&N Dec. 309 (BIA 1998), the applicant had an affirmative duty to corroborate his claim to the degree he could or otherwise reasonably explain the failure to do so. Zhao did neither.

The IJ wrote a twenty-three page analysis supporting her finding that Zhao was not credible. In arriving at her conclusion, she considered: (1) the "rationality, internal consistency and inherent persuasiveness of the respondent's testimony" compared to his written application for relief and found it was not believable or consistent; (2) his failure to provide corroborating evidence, and found it was not reasonable; and (3) Zhao's explanations for the inconsistencies and failure to provide corroboration, and did not find them convincing. She found that these inconsistencies went to the heart of Zhao's claims.

The IJ also explained that, even had she found Zhao credible, she would have denied his application on the merits. Specifically, the IJ set forth in an additional seven page analysis that: (1) Zhao could not meet his burden of proof with his general and meager testimony; (2) China had changed country conditions making it safe for him to return, as set forth in a U.S. Department of State Country Report on Human Rights Practices; (3) Zhao could not show fear of persecution in his native Fujian Province since the 2004 Profile of Asylum Claims and Country Conditions (the Profile) cited only "isolated cases" of forced abortions and sterilizations there in the early 1990s;[7]

---

[7] The IJ elaborated that "in light of this information, it is difficult for this Court to discern that the respondent can establish that it is more likely than not that he would be subject to persecution if returned to China based upon his first wife having purportedly undergone an abortion (despite the fact that this Court doesn't have a single piece of evidence to establish even the existence of this first wife, let alone a pregnancy or abortion)."

(4) Zhao's claim that he would encounter difficulties due to the child conceived in the U.S. was too tenuous since, according to the Profile, "couples occasionally seek asylum based on a claimed fear that an unauthorized child already born in the United States or one that has been conceived here would prompt difficulties in China . . . [but] there is no known policy as to such instances;" (5) Zhao's claimed fear from having "no idea" what local government would do to him and that he had "nothing left" in China was vague; and (6) Zhao's fear, after striking the "family planning" official, was of *prosecution* for a criminal offense rather than *persecution* for political beliefs. Further undercutting the merits of Zhao's claim, the IJ found evidence, based on Zhao's testimony of unrestricted "sightseeing" in Hong Kong, that he could relocate within China without fear of persecution.

> In conclusion, the IJ stated,

> The respondent has not been back to China, if you believe his testimony, for more than ten years. This Court cannot, on this record, determine that anyone would seek to target the respondent based upon any past persecution that he claims he suffered as a result of his wife undergoing the first forced abortion and his resistance to that or any well-founded fear of future persecution arising out of any fear he has due to this attack on this police officer.

Based on the foregoing, the IJ "den[ied] the respondent's applications for withholding under the Act and the Torture Convention on the merits."

> D.    Findings of the Board of Immigration Appeals

Zhao appealed the IJ's decision, asserting first that she erred by basing her adverse credibility finding on "purported inconsistencies and omissions in the record" when his testimony "did not preclude the possibility that he had suffered from physical harm by the Chinese officials." Next, Zhao argued that the IJ violated his "due process rights" by failing to articulate any legal standards upon which she based her credibility determination. Finally, Zhao asserted that the IJ's decision to deny relief based on adverse credibility was erroneous.

Using a clear error standard, the BIA reviewed the IJ's factual determinations and accepted her finding that Zhao was not credible. Citing *Sylla v. INS,* 388 F.3d 924, 926 (6th Cir. 2004) (holding that an adverse credibility determination must be supported by specific reasons), the BIA concluded that the IJ's decision was based on "conspicuous, inadequately explained discrepancies" in the respondent's testimony, and between his testimony and his withholding application and statement.[8] The BIA next rejected Zhao's assertion that the IJ failed to base her findings on applicable legal standards. Finally, given Zhao's lack of credibility, the BIA affirmed the IJ, finding "no error in the Immigration Judge's decision denying his application for removal."

Like the IJ, the BIA found that, even if credible, Zhao could not advance a claim for withholding of removal based on a fear that an unauthorized child conceived or born in the United States would prompt difficulties in China. Citing *In re J-W-S-*, 24 I&N Dec. 185 (BIA 2007) (concluding that the Chinese Government did not have a *national* policy forcing sterilization of parents returning with a second child born outside of China), the BIA determined that Zhao could not claim that he feared persecution for a child conceived with his new wife because it would really be his "first" child and would not violate China's one-child policy.

The BIA also based its opinion in part on an issue not raised by the IJ. Noting that the IJ "properly concluded" that Zhao and Qing were not legally married, the BIA determined that respondent was ineligible for withholding on the "basis of his girlfriend's alleged coerced abortion." Relying on *In re S-L-L-,* 24 I&N Dec. 1, at *10 (BIA 2006) (holding that an alien can establish fear of persecution based on spouse's forced abortion)*,* the BIA ruled that Zhao could not assert Qing's forced abortion as a basis of fear of persecution because she was not his spouse.[9]

---

[8]The BIA identified the document as an "asylum application," but it was an application for withholding.

[9]*In re S-L-L-* was overruled to the extent it allowed the IJ or the BIA to find an applicant had *per se* been persecuted on the basis of the applicant's spouse's forced abortion or sterilization. *See In re J-S-*, 24 I&N Dec. 520, 536-38 (A.G. 2008), discussed *infra*.

The BIA noted that Zhao also requested withholding of removal under the CAT. The BIA determined, however, that Zhao failed to provide substantial evidence that he was tortured in the past in China or that any government official would torture him upon return. Thus, the BIA also denied Zhao's request for withholding of removal under the CAT.

The BIA "dismissed" Zhao's appeal on August 9, 2007. Zhao now appeals the BIA's decision.

## II. LAW AND ANALYSIS

A.        Withholding of Removal under the Act and the CAT

To establish a claim for withholding of removal under section 241(b)(3)(B) of the Act, an applicant must demonstrate a clear probability that his life or freedom would be threatened in the country directed for removal on account of his race, religion, nationality, membership in a particular social group, or political opinion. *INS v. Stevic,* 467 U.S. 407 (1984). *See also* footnote 2, *supra.* A person who has been forced to abort a child, undergo sterilization, or who has been persecuted for refusal to undergo such a procedure shall be deemed to have been persecuted on account of political opinion. 8 U.S.C. § 1101(a)(42); *In re X-P-T-*, 21 I&N Dec. 634 (BIA 1996).

This Court has elected to revise its initial opinion, now published at 553 F.3d 436 (6th Cir. 2009), because the government has asked us to incorporate the Attorney General's opinion in *In re J-S-,* 24 I&N 520 (A.G. 2008), a case that overrules any *per se* grant of asylum to applicants whose spouses have been subject to forced abortion or forced sterilization. Our acknowledgement of the Attorney General's opinion does not alter the substance, rationale, or ruling on the issues presented for review.

*In re J-S-* instructs the BIA and IJ to cease applying the rule, articulated in *In re C-Y-Z-*, 21 I&N Dec. 915 (BIA 1997) (*en banc*), and *In re S-L-L-*, 24 I&N Dec. 1 (BIA 2006) (*en banc*), that applicants whose spouses have been forced to undergo abortion or

sterilization are *per se* deemed to have been persecuted for the purposes of establishing refugee status.[10]  The Attorney General held:

> [T]he Board and Immigration Judges shall cease to apply the per se rule of spousal eligibility articulated in *C-Y-Z* and *S-L-L-* and shall instead engage in a case-by-case assessment of whether a section 601(a) applicant who has not physically undergone a forced abortion or sterilization procedure can demonstrate that (i) he or she qualifies as a refugee under section 601(a) on account of persecution for 'failure or refusal' to undergo such a procedure or for 'other resistance' to a coercive population control program; (ii) he or she has a well-founded fear of being forced to undergo an abortion or involuntary sterilization procedure or of being persecuted for failing or refusing to undergo such a procedure or for 'other resistance' to a coercive population control program; (iii) the specific facts of his or her case justify asylum on grounds other than those articulated in section 601(a); or (iv) he or she satisfies the requirements for derivative asylum expressly set forth in section 208(b)(3)(A) of the Act.

*In re J-S-*, 24 I&N Dec. at 537-38.

To establish eligibility for relief under the CAT, the applicant must show he would be tortured if removed to the proposed country of removal.  8 C.F.R. § 1208.16(c).  *See* footnote 2, *supra.*

B.      Standard of Review

When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review.  *Ka v. Gonzales,* 236 F. App'x 189, 191 (6th Cir. 2007) (citing *Singh v. Ashcroft,* 398 F.3d 396, 400-01 (6th Cir. 2005)).[11]  "This court reviews any legal conclusions de novo and factual

---

[10]The Court is aware that Zhao applied for withholding of removal under 8 U.S.C. § 1231(b)(3)(A) and that the standards for granting refugee status for asylum under 8 U.S.C. § 1101(a)(42)(B) and withholding of removal differ. *Gilaj v. Gonzales*, 408 F.3d 275, 283-84, 289-90 (6th Cir. 2005) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-32 (1987)).  The "clear probability" standard used in withholding of removal cases is more stringent than the "well-founded fear of persecution" standard used in asylum cases. *Id.*  Because the withholding of removal standard is higher than that governing asylum, an applicant who fails to establish a well-founded fear of persecution for purposes of establishing asylum is necessarily ineligible for withholding of removal. *Lumaj v. Gonzales,* 462 F.3d 574, 578 (6th Cir. 2006) (citing *Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998)).

[11]*See also Koulibaly v. Mukasey,* 541 F.3d 613, 619 (6th Cir. 2008) (stating that this Court reviews the decision of the BIA where the BIA renders its own decision).

findings and credibility determinations for substantial evidence." *Id.* The Court of Appeals "directly reviews the decision of the IJ while considering the additional comment made by the BIA." *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007).

"Although this Court reviews the BIA's legal conclusions de novo, it must defer to the BIA's reasonable interpretations of the INA." *Koulibaly v. Mukasey,* 541 F.3d 613, 619 (6th Cir. 2008) (quoting *Patel v. Gonzales,* 432 F.3d 685, 692 (6th Cir. 2005)). "Factual findings are reviewed under a substantial evidence standard 'in which we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* (quoting *Marku v. Ashcroft,* 380 F.3d 982, 986 (6th Cir. 2004)); *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007). "Under this deferential standard, the court may not reverse the Board's determination simply because we would have decided the matter differently." *Koulibaly,* 541 F.3d at 619 (quoting *Ouda v. INS,* 324 F.3d 445, 451 (6th Cir. 2003)) (internal quotation marks and citations omitted). "Unless 'any reasonable adjudicator would be compelled to conclude to the contrary,' the BIA's findings of fact are 'conclusive.'" *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)).

Facts relevant to credibility determinations as applied to withholding of removal and relief under the CAT are reviewed under this same standard. *Id.* (citing *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004)) (applying the substantial evidence standard to a credibility determination); *Almuhtaseb v. Gonzales,* 453 F.3d 743, 749 (6th Cir. 2006) (applying § 1252(b)(4)(B) to a decision requesting withholding under the Act and the CAT). "Thus, the BIA's determination should be upheld unless evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" *Koulibaly,* 541 F.3d at 619-20 (quoting *Ouda,* 324 F.3d at 451) (internal citation omitted and emphasis in original).[12]

---

[12]At the request of the government, the Court has eliminated reference to the credibility provisions in the REAL ID Act, which were not in effect at the time of Zhao's application in 2003. Eliminating this language does not affect our ultimate ruling.

1.      Merits of Zhao's Applications under the Act and the CAT

In this case, the BIA adopted the IJ's finding that Zhao was not credible and concurred with the IJ that, even if credible, Zhao was not entitled to withholding based on a fear of persecution for a child born in the United States. The basis for this Court's review, then, is the IJ's finding that Zhao was not credible and, even if credible, could not advance a valid claim of fear of persecution based on a second child born in the United States. *Ka,* 236 F. App'x at 191.**13**

However, on appeal, Zhao has not challenged the determination by the IJ and the BIA that the child with his current spouse in the U.S. provided no basis for withholding of removal. Thus, we will not consider the issue. "It is a well-established rule that this Court will not consider claims that are presented for the first time on appeal nor arguments that are not properly raised below." *Berryman v. Rieger*, 150 F.3d 561, 568 (6th Cir. 1998).

Therefore, we begin our analysis by reviewing the finding of the IJ that Zhao lacked credibility. We consider each of the grounds relied upon by the IJ, and adopted by the BIA, in order to determine whether the adverse credibility determination was supported by substantial evidence, or whether a reasonable adjudicator would be compelled to conclude to the contrary. *Koulibaly,* 541 F.3d at 619-20.

a.      *The Date of the Forced Abortion*

In his application, Zhao stated that his wife's forced abortion was "earlier February, 1994," yet in his testimony he stated it was December 1993. He could not explain the inconsistency and had no corroborating evidence of the marriage or the abortion. The forced abortion goes to the heart of his claim for withholding based on fear of persecution, and the IJ properly found inconsistencies on this topic significant.

---

**13**The BIA made the additional argument that, even if credible, Zhao could not claim fear of persecution for his former wife's forced abortion as she was not really his wife but his girlfriend. Because this Court affirms on other grounds, we need not further consider the BIA's additional argument.

b.       *The Assault of the "Family Planning" Officer*

In his application, Zhao indicated "I caught the officer and hit him a couple times and run away."  In his testimony he stated that he was out on the street with a friend and "hit [the officer] once."  The IJ properly placed importance on this discrepancy as this encounter tended to enhance Zhao's claim of fear of persecution from the officials.  The IJ noted that, standing alone, she would "overlook this inconsistency" except that it was attached to another--the warning call.

c.       *The Warning Call at Zhao's Mother-in-Law's Home*

Zhao's application stated that the call came from his father, but he testified that it came from a female cousin.  The IJ was troubled by this inconsistency, especially since Zhao had an opportunity to review his application before the hearing and did not change the statement that his "dad" called him.  While we are not as troubled with this inconsistency (the call may have come from a cousin on behalf of his father), the IJ's finding is supported by the record and we defer to her determination. *Koulibaly*, 541 F.3d at 619.

d.       *Zhao's Whereabouts after Fleeing his Home*

One of the most confusing and conflicting portions of Zhao's testimony was his whereabouts after his father or cousin told him the police had come after him.  Whereas his application stated that he was "running around at my relatives' houses" for about a year after this, he testified that he was *sightseeing* in several different cities for a few *months*.  He testified next that he came to the U.S. from Hong Kong, then contradicted himself *during the hearing* by stating that he arrived from Singapore.  The IJ found Zhao's explanations to be "almost incoherent" and characterized them as attempts to "weave stories" to cover the inconsistencies.  He had no evidence to corroborate where he was.  The IJ properly noted that this contradictory testimony "hangs together" with other inconsistencies eroding Zhao's credibility. *See In re A-S-,* 21 I&N Dec. 1106, 1112 (BIA 1998) (quoting *In re Lugo-Guadiana,* 12 I&N Dec. 726, 729 (BIA 1968)).

e.     *The "Not Decent Citizen" List*

Zhao's application stated that he was on a "not decent citizen list," yet he forgot about this until examined by the IJ.  Although this inconsistency may be the fault of his counsel for failing to elicit this during his direct examination, the fact remains that the IJ, present for Zhao's testimony, found it to be relevant to his credibility.  We will not disturb this finding.

f.     *Corroborating Evidence*

The IJ properly focused on Zhao's failure to provide corroborating evidence, especially where his testimony was riddled with inconsistencies.  She was correct to find that the absence of even a letter from his father or cousin to confirm his testimony further undermined his credibility.

Courts upholding an IJ's adverse credibility findings have done so on grounds similar to those advanced by the IJ.[14]  The inconsistencies the IJ noted, and the BIA adopted, related to issues tending to enhance Zhao's claims of persecution.  As the government noted, Zhao could not identify evidence sufficient to compel a conclusion contrary to the IJ's conclusion where the record provided numerous omissions and inconsistencies relating to the heart of his claim.  Combined with a complete lack of corroborating evidence, these findings, like those in similar cases cited *supra*, constitute substantial evidentiary support of adverse credibility.  We conclude that the IJ appropriately focused on five significant discrepancies or inconsistencies related to the

---

[14]For example, adverse credibility findings were upheld in *Shjefni v. Gonzales*, 229 F. App'x 388, 390 (6th Cir. 2007) (holding that contradictory testimony, discrepancies between the application and testimony, and lack of corroborating evidence on physical mistreatment during incarceration and detention by police supported adverse credibility finding), and *Dashi v. Gonzales,* 214 F. App'x 581, 584-85 (6th Cir. 2007) (concluding that discrepancies between the application and testimony regarding details of mistreatment and lack of corroborating evidence, such as witness statements from his wife or letters from his political party to the effect that he was persecuted, supported adverse credibility finding). *But see Koulibaly v. Mukasey,* 541 F.3d 613, 624 (6th Cir. 2008) (holding that minor inconsistencies, including those regarding her location when arrested, whether she was beaten, her husband's arrest and her escape from hospital did not support adverse credibility determination), and *Mapouya v. Gonzales*, 487 F.3d 396, 406-10 (6th Cir. 2007) (holding that substantial evidence supported credibility where IJ failed to explain, for example, why applicant's use of "fighter" in one instance and "supporter" in another substantially changed his application and where IJ relied on inconsistencies that were irrelevant to fear of persecution).

heart of his claim and properly considered Zhao's lack of corroboration. We find no evidence compelling a different conclusion.

Facts relevant to credibility determinations regarding applications for withholding under the Act and the CAT are reviewed under the same standard. *Koulibaly,* 541 F.3d at 619. Since Zhao has failed to satisfy the threshold showing of credibility to warrant withholding of removal under the Act, it logically follows that he cannot demonstrate that he is entitled to relief under the CAT. Thus we also reject Zhao's claims under the CAT.

2.      Evaluation Under an "Inappropriately Stringent Standard"

In his brief, Zhao argues that the credibility findings should be reversed because the IJ held him to an "inappropriately stringent standard."[15] The IJ meticulously explained the bases for her conclusions and properly applied the law. Therefore, we reject Zhao's contention.

III. CONCLUSION

The IJ in this case took great care to fully explain her analysis and the basis for her decision that Zhao was not credible. Our review reveals that her findings were supported by reasonable, substantial and probative evidence in the record. *Mapouya,* 487 F.3d at 405. There is nothing in the record to compel us to reach a contrary conclusion. *Koulibaly,* 541 F.3d at 619-20. We therefore affirm the BIA's adoption of the IJ's decision that Zhao was not credible and not entitled to withholding of removal under section 241(b)(3)(B) of the Act or relief under the CAT.

---

[15] Citing a Second Circuit case, *Secaida-Rosales v. INS*, 331 F.3d 297 (2d Cir. 2003), Zhao contends that this stringency renders the IJ's decision an error in law requiring de novo review by this Court. In *Secaida-Rosales*, however, the IJ criticized minor discrepancies that went to collateral matters. The IJ in this case focused on major discrepancies on several critical issues enhancing Zhao's alleged fear of persecution.