**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0985n.06

No. 12-3791

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Nov 15, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NERINGA VENCLAVICIUTE;<br>DEIVIS SUBECKIS, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE UNITED STATES |
| ERIC H. HOLDER, JR., Attorney General, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| Respondent. | ) | |
| | ) | OPINION |

BEFORE:  GIBBONS and STRANCH, Circuit Judges; HOOD, District Judge.[*]

**JANE B. STRANCH, Circuit Judge**.  Neringa Venclaviciute and her husband, Deivis Subeckis, petition for review of an order of the Board of Immigration Appeals (BIA) dismissing their appeal from an immigration judge's (IJ) decision denying Venclaviciute's application for asylum and withholding of removal.  Because substantial evidence supports the agency's adverse credibility finding, we deny Venclaviciute's petition for review, as well as Subeckis's, as his claims for relief are entirely derivative of his wife's application.

Venclaviciute, a native and citizen of Lithuania, entered the United States on an exchange-visitor visa on or about June 25, 1998.  Venclaviciute adjusted her status and obtained a tourist visa

---

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

with authorization to remain in the United States until April 19, 1999. Venclaviciute remained in the United States beyond that date; she subsequently gave birth to a child and married Subeckis, also a native and citizen of Lithuania.

On December 31, 2001, Venclaviciute filed an application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), including Subeckis as a derivative beneficiary. Venclaviciute claimed that Lithuanian authorities and nationalists persecuted her and her family because of their Jewish religion and ethnicity. The former Immigration and Naturalization Service served Venclaviciute and Subeckis with notices to appear, charging them with removability pursuant to § 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(B), as aliens who remained in the United States without permission. Venclaviciute and Subeckis admitted the factual allegations in the notices to appear, with the amendment of Venclaviciute's date of entry, and conceded removability as charged.

Venclaviciute subsequently withdrew her requests for CAT protection and voluntary departure. Following a hearing on the merits, the IJ denied Venclaviciute's application for asylum and withholding of removal. Noting that the REAL ID Act of 2005 did not apply to Venclaviciute's application, the IJ found that she lacked credibility and that her documentary corroboration fell short of substantiating her claims. The IJ went on to find that Venclaviciute's asylum application was time-barred and that she otherwise failed to establish eligibility for asylum and withholding of removal.

Venclaviciute and Subeckis filed a timely appeal, which the BIA dismissed. The BIA upheld the adverse credibility finding and declined to address the IJ's other rulings. This timely petition for review followed.

"In cases where the BIA has issued a separate opinion, instead of summarily affirming the IJ's decision, we review the BIA's decision as the final agency determination." *Dieng v. Holder*, 698 F.3d 866, 871 (6th Cir. 2012). The agency's adverse credibility finding is a finding of fact reviewed for substantial evidence and is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see El-Moussa v. Holder*, 569 F.3d 250, 255–56 (6th Cir. 2009). Because Venclaviciute filed her application prior to the effective date of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, the agency's adverse credibility determination "'must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim,'" *Abdurakhmanov v. Holder*, 666 F.3d 978, 982 & n.3 (6th Cir. 2012) (quoting *Ceraj v. Mukasey*, 511 F.3d 583, 591 (6th Cir. 2007)), rather than the lowered standard under the Act.

The BIA first noted inconsistencies in Venclaviciute's testimony about her alleged persecution in Lithuania. Venclaviciute testified that her classmates made fun of her when she was a child and made comments like, "kill this little Jew." Asked how the other children knew that she was Jewish, Venclaviciute responded that they probably saw her family going to synagogue and celebrating holidays. When the government's attorney pointed out that Lithuania was under Soviet rule at the time and that religious practices were hidden, Venclaviciute testified that she did not know how her classmates knew that she was Jewish. The BIA drew a negative inference from this.

Venclaviciute also testified on direct examination that she was attacked in March 1998 by three men who called her names, smashed her head into a wall, kicked her in the stomach, and spit on her. She subsequently testified on cross examination that she was not kicked during this assault.

Venclaviciute's testimony as to her childhood experience does not support the agency's adverse credibility finding, but the BIA's assessment of her telling of the March 1998 assault does. Venclaviciute explained that while religion was prohibited, some Lithuanian Jews engaged in religious practices surreptitiously in one another's homes and that her father took her to a synagogue in something like the basement of a house. Because she lived close to other children at her school, "they probably saw us going to synagogue and . . . celebrating holidays." Venclaviciute's explanation was fully consistent with the government attorney's point that religion was not openly observed, so no negative inference could fairly be drawn from it. With respect to the March 1998 assault, however, Venclaviciute attempted to pin the discrepancy as to whether or not she was kicked on the fact that "it was a long time ago." While 12 years is a long time to remember the particular manner of a physical assault, the discrepancy occurred in a much shorter time period, between Venclaviciute's testimony on direct examination stating that she was kicked and her admission on cross-examination that she was not. While the first inconsistency the BIA cited is not grounds for an adverse credibility determination, Venclaviciute's contradictory testimony about the details of the assault on her lends support to the agency's adverse credibility finding.

The BIA next addressed the omissions from Venclaviciute's affidavit submitted in support of her application. Venclaviciute testified that after three women beat her up at a bus stop in February 1996, she and her parents went to the police station to report the incident. The BIA noted

that Venclaviciute's affidavit, however, failed to mention any police report following this incident. The agency also observed that Venclaviciute's affidavit also failed to mention any assault on her father, when she testified at the hearing that her father was beaten up once when she was a teenager.

"Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005). But "omissions in an application that do not directly contradict an applicant's subsequent testimony before the IJ may not form the basis of an adverse credibility finding." *Sinani v. Holder*, 418 F. App'x 475, 479 (6th Cir. 2011) (citing *Liti*, 411 F.3d at 637–38). Venclaviciute's asylum application may be silent as to whether she reported the bus-stop assault to the police, but this silence does not "directly contradict" her subsequent testimony that she did report it. In a similar vein, Venclaviciute's failure to mention the assault on her father does not support an adverse credibility determination because it is not inconsistent with any subsequent testimony. Moreover, we have previously rejected the BIA's "underlying rationale" that asylum applicants are "required to provide an exhaustive, detailed list" of the instances or activities supporting their claim to asylum or withholding. *Liti*, 411 F.3d at 638. "The purpose of holding a removal hearing is not simply to reiterate the statements made in the asylum application, but rather to allow an alien 'to present evidence on the alien's own behalf' including to elaborate on the generalized claims made in the application itself." *Id.* at 639 (quoting 8 U.S.C. § 1229a(b)(4)(B)). Because the statements Venclaviciute made in her asylum application were not inconsistent with her subsequent hearing testimony, the BIA's adverse credibility finding is not supported by this evidence.

The BIA further noted Venclaviciute's shifting explanations for her failure to file her asylum application within one year of her arrival in the United States. In her initial application, Venclaviciute provided the following explanation: "I had recently found out about events of severe persecution that happened to members of my family due to our Jewish religion and of threats directed toward me and my family." In support of this, Venclaviciute elaborated at the hearing that her brother's car window had been smashed and a note in German that read "Jew must die" was left inside the car. She also told that her other brother was not selected for the Lithuanian national basketball team because of his religious faith.

But Venclaviciute's testimony at the hearing was different. There, Venclaviciute explained that she did not file her application by June 1999 because she "didn't know what to do" and "was very weak," relating that she had been confined to bed rest because of pregnancy complications at that time. The trouble for Venclaviciute is that her testimony indicates she was working during some part of time that she was purportedly on bed rest. Although the hearing transcript suggests that Venclaviciute may have sown confusion by misunderstanding the IJ's question,[1] an error she

_____

[1]Venclaviciute had the following exchange with the IJ:

Q: And when did you work for [your employer]?
A: In 1998, it was Summer.
Q: Summer of 1998?
A: In 1999 October.
Q: From the Summer of 1998 to October of '99?
A: Yes.

*See* A.R. 305.

corrected moments later,[2] we nevertheless conclude the BIA was justified in determining that Venclaviciute testified inconsistently as to her failure to timely file her asylum application.

Finally, the BIA determined that Venclaviciute failed to provide sufficient corroborating evidence to support her claims. Where an applicant's testimony could be viewed as incredible, the failure to provide corroborating evidence may provide further support for an adverse credibility determination. *See Zhao v. Holder*, 569 F.3d 238, 248–49 (6th Cir. 2009). Venclaviciute's father, who lives with her in the United States and is healthy enough to work in a pizzeria, neither testified nor provided an affidavit in support of her claims. Nor did Venclaviciute's two brothers living in Lithuania provide a corroborating statement. Venclaviciute's mother submitted an affidavit, but it only addressed a May 1998 assault and mentioned no other incidents of alleged persecution. Venclaviciute also failed to provide any medical records regarding complications related to her 1999 pregnancy, despite having several years to obtain them.

In sum, although certain aspects of the BIA's adverse credibility determination ran afoul of the law in this circuit, the record does not compel a contrary credibility determination. *See id.* at

---

[2]Almost immediately following her affirmation that she worked until October 1999, Venclaviciute said the following:

> Q:  So you were working while you were pregnant with your first child?
> A: No.
> Q:  Your first child was born December of 1999?
> A: Yes.
> Q:  And you told me you worked from Summer of '98 to October of 1999.
> A:  Excuse me, I made mistake, I was working until 1998 October.

*See* A.R. 306.

249.   Given the inconsistencies in Venclaviciute's testimony about her alleged persecution in Lithuania, as well as her undisputed failure to corroborate her claims, Venclaviciute has "failed to satisfy the threshold showing of credibility"; thus, she cannot demonstrate that she is entitled to asylum or withholding of removal.  *Id.*  As a result, we deny her petition for review.  And because Subeckis's petition is derivative of hers, we deny his petition as well.

**JULIA SMITH GIBBONS, Circuit Judge, concurring.** I agree with the result in this case but am unable to endorse the majority's reading of our unpublished, non-precedential case law. The majority uses language from our opinion in *Sinani v. Holder*, 418 F. App'x 475 (6th Cir. 2011), to craft a blanket rule that omissions from an asylum application can never form the basis for an adverse credibility determination unless the omission "directly contradict[s] an applicant's subsequent testimony." The creation of this rule overstates the holding of *Sinani* and, more importantly, of *Liti v. Gonzales*, 411 F.3d 631 (6th Cir. 2005), on which *Sinani* purportedly relies.

*Liti* is directed to improper credibility determinations based on testimony that is more specific than the brief statements typically contained in an asylum application. The result of *Liti* turns on the substantiality of the omissions. *Id.* at 637. *Liti* says nothing about whether testimony directly contracts an omission. In fact, common sense tells us that an omission cannot be in direct contraction with a later affirmative statement. And *Liti* recognizes that of course, "omissions may form the basis of an adverse credibility determination." *Id.*

Although *Sinani* does contain the language cited by the majority and purports to draw this conclusion from *Liti*, what was at issue in *Sinani* was Sinani's use of the more specific word "rape" in subsequent statements while the first version of her asylum application referred to "physical abuse." As the *Sinani* panel correctly observed, there was no basis for an inconsistency finding because "physical abuse" does not exclude "rape." 418 F. App'x at 479.

In short, the language from *Sinani* on which the majority relies is not found in *Liti*, is not the basis for decision in *Sinani*, and is inconsistent with the reality that omissions do not "directly

contradict" affirmative statements. As we have noted in a published opinion, *Liti* is appropriately characterized as a warning to "exercise[] extra care in evaluating omissions from asylum applications" given the "difficulties asylum seekers face in providing exhaustive accounts in asylum applications." *Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005).