NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0156n.06

Case No. 15-3492

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 18, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ANDREW NJUGUNA CHEGE; MIRIAM CHEGE; SHARON WAIRIMU CHEGE, | ) ) ) | |
| Petitioners | ) ) | ON PETITION FOR REVIEW FROM THE UNITED STATES |
| v. | ) ) | BOARD OF IMMIGRATION APPEALS |
| LORETTA E. LYNCH, U.S. Attorney General, | ) ) | |
| Respondent. | ) ) ) | |

_____/

Before: COLE, Chief Judge; MERRITT and GRIFFIN, Circuit Judges.

**MERRITT, Circuit Judge.** Andrew, Miriam, and Sharon Chege petition for review of the Board of Immigration Appeals' decision affirming an Immigration Judge's finding that they are not entitled to protection under the United Nations Convention Against Torture. The Cheges claim that, as ethnic Kikuyu of Christian faith, they will be tortured by members of the Mungiki ethnoreligious criminal organization if they are removed to Kenya.

Upon review, we hold that the administrative decisions were supported by substantial evidence, and that the Cheges' evidence does not compel the conclusion that they are more likely than not to be tortured if removed to Kenya. The petition for review is therefore **DENIED**.

## I. Facts and Procedural History

Andrew, Miriam, and Sharon Chege originally hail from Nakuru, Kenya, in that country's Rift Valley region. Administrative Record ("A.R.") 64. They are Protestant Christians of the Kikuyu ethnicity. A.R. 65. Andrew was admitted to the United States on February 20, 2003, on a J-1 visitor exchange visa. A.R. 235, 284. His wife Miriam and daughter Sharon followed on August 12, 2003, and were admitted on B-2 visitor visas. A.R. 953. All three overstayed their visas. A.R. 185, 198, 207, 235-239.

Andrew applied for asylum, withholding of removal, and protection under the Convention Against Torture on February 1, 2008. A.R. 952-65. On January 12, 2009, Andrew, Miriam, and Sharon were served with Notices to Appear, charging them as being removable for overstaying their visas. A.R. 994, 1045, 1094. Andrew and Miriam appeared before Immigration Judge D. William Evans, Jr. in Cleveland on June 28, 2010. A.R. 255-57. At that time, Miriam and Sharon filed their own applications for asylum, withholding of removal, and protection under the Convention Against Torture. A.R. 1012, 1065.

At that hearing, the Cheges established that they sought protection on religious and racial grounds (as Kikuyu Christians), and withdrew claims of persecution on account of political opinion. A.R. 272-74.

Andrew first testified to an incident in 1987 where he was beaten by Mungiki attackers while walking outdoors. A.R. 297. The Mungiki are a sort of ethnoreligious gang seeking to forcibly restore traditional religious and cultural practices in Kenya through violence and violent political activity. *See* A.R. 732-37. Andrew did not seek medical attention for his injuries, and did not report the attack to police because he believed they could not be trusted, and he worried that the Mungiki would get word of a report and attack him again. A.R. 299-300. He also

testified to a series of incidents in 1996 when suspected Mungiki raiders attempted on three consecutive nights to break into the apartment he shared with Miriam, breaking their window and attempting to break down their door. A.R. 303-12. Andrew and Miriam did not report the incidents to police, because they did not expect the police to protect them, and worried it might provoke another attack. A.R. 309. Shortly after the incidents, they moved out of their apartment. A.R. 311. Andrew also testified to an attack in his Nakuru neighborhood in January 2003, when the Mungiki randomly killed 22 people. A.R. 312-15. Andrew and his family were unharmed, and Andrew did not know the ethnicities of the victims. A.R. 314-15. Andrew also spoke of his fear that the Mungiki would attempt to force female genital mutilation upon Miriam and Sharon, and his fear that his family would be targeted by the Mungiki for being Christian and not adhering to traditional religion. A.R. 317-20, 337. Finally, he spoke of ethnic violence he had heard of following the 2007 elections in Kenya, which resulted in his Aunt's house being burned down, but he did not attribute the violence to the Mungiki. A.R. 320-26.

Miriam also testified to the 1996 break-in attempts, A.R. 431-36, the 2003 massacre in Nakuru, A.R. 438-41, and the violence after the 2007 elections, A.R. 447-48. She said she feared that she and her family, as Kiyuku Christians, would be targeted for violence — including female genital mutilation — by the Mungiki. A.R. 430, 452-54. Although Miriam had heard of the Mungiki forcibly mutilating women, she did not know anybody to whom it had happened. A.R. 452-54, 460-61.

Miriam continued testifying on cross- and re-direct examination at another hearing on June 28, 2012. A.R. 473-542. Among other things, she testified to the violence she had heard about following the 2007 election, which she attributed to the Mungiki. A.R. 536. She did not

connect the Mungiki's violence to the government, and stated that the newly elected president was not associated with the Mungiki. A.R. 539.

At that same hearing, the Cheges also offered the expert testimony of Dr. Robert Blunt, an academic specializing in "the sociology, anthropology and culture of Kenya . . . [with] a specific emphasis . . . on the religious issues in Kenya." AR. 544. Blunt testified telephonically about the violent activities of the Mungiki in Kenya (and the Rift Valley specifically), their use of forced female genital mutilation, their relationship with Kenyan authorities, and their role in violence surrounding elections. A.R. 547-616. The Cheges also submitted a written declaration by Dr. Blunt on the same subjects. A.R. 722-40.

On July 15, 2013, the Immigration Judge found the Cheges to be credible but denied relief. A.R. 197-204. He held that the Cheges' asylum and withholding claims were time-barred for not having been filed within one year of their arrival, and that the Cheges had failed to show changed circumstances justifying the failure to file in time. A.R. 198. Alternatively, the Immigration Judge held that the Cheges had failed to demonstrate past persecution or a well-founded fear of future persecution in Kenya on account of being Kikuyu or Christian (the standard for Asylum eligibility, *see* 8 U.S.C §§ 1101(a)(42)(A), 1158(b)(1)(A)), because: the 1987 attack on Andrew and 1996 break-in attempts were not shown to be motivated by any protected characteristic of the Cheges, A.R. 199-200; the 2003 violence did not target the Cheges; and widespread "danger from civil strife and anarchy generally does not rise to the level of persecution," A.R. 200 (citing *Matter of Sanchez and Escobar*, 19 I & N Dec. 276 (BIA 1985). The Immigration Judge also found that the Cheges had not shown evidence that it was "even a reasonable possibility" that Miriam and Sharon would be subjected to female genital

mutilation because they knew nobody who had been, although half of Kenyan women ages 15-49 had undergone mutilation. A.R. 202.

Overall, the Immigration Judge found that because the Cheges had failed to show past persecution or a well-founded fear of future persecution, they necessarily failed to meet the standard for withholding of removal: that it was more likely than not that they would be persecuted if removed to Kenya. A.R. 203 (citing INA § 241(b)(3)(A) (8 U.S.C. § 1231(b)(3)(A))). Finally, the Immigration Judge held that the Cheges failed to qualify for protection under the Convention Against Torture because:

> There has been no evidence presented to prove that it is more likely than not that the respondents would be subjected to torture in Kenya by, at the instigation of, or with the consent or acquiescence of the government of Kenya, a public official of that government, or a person acting in an official capacity.

*Id.*

The Cheges appealed all of the Immigration Judge's holdings to the Board of Immigration Appeals. A.R. 61-108. Their brief to the Board made only a cursory argument for protection under the Convention Against Torture, A.R. 106-107, and made no argument that Kenyan authorities instigated, consented to, or acquiesced to torture by the Mungiki or any other group. A.R. 61-108. The Board affirmed, finding: that the Cheges' asylum and withholding applications were time-barred; that they failed to show past persecution or a well-founded fear of future persecution — including forced female genital mutilation — on the basis of a protected characteristic; that because they failed to meet the burden of proof for asylum eligibility, they necessarily failed to meet the higher burden of proof for withholding of removal; and that they were not entitled to protection under the Convention Against Torture because "the respondents failed to demonstrate that, upon removal to Kenya, it is more likely than not that they would be tortured by or at the instigation of, or with the consent or acquiescence (to include the concept of

willful blindness) of, a public official or other person acting in an official capacity." A.R. 3-5 (citations omitted).

The Cheges now bring this appeal, and waive their asylum and withholding claims. They argue only that they are entitled to protection under the Convention Against Torture because they will be subjected to physical violence, including female genital mutilation, by the Mungiki if returned to Kenya.

## II. Discussion

To secure withholding of removal under the Convention Against Torture, an applicant has the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined by regulation as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id*. § 208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id*. § 208.18(a)(7). Acquiescence by public officials includes "willful blindness." *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006) (citation and internal quotation marks omitted).

Whether an applicant for withholding of removal under the Convention has shown a probability of future torture is a factual determination that we review for "substantial evidence"

and reverse only if a "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Zhao v. Holder*, 569 F.3d 238, 247 (6th Cir. 2009) (citations omitted).

When the Board of Immigration Appeals reviews the Immigration Judge's decision and issues a separate opinion, rather than summarily affirming the Immigration Judge's decision, this Court reviews the Board's decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But, to the extent the Board adopted the Immigration Judge's reasoning, this Court also reviews the Immigration Judge's reasoning that the Board adopted. *Id*. Here, the Board issued its own opinion, and that opinion is the subject of our review. Though the Board's opinion engages with the record, its citations to the record are fairly limited, *see* A.R. 3-5, suggesting that it adopted some of the Immigration Judge's reasoning. We therefore review both administrative decisions.

The Cheges offered extensive evidence in their administrative proceedings — including personal testimony, expert testimony, and documentary evidence — but those submissions fell short of establishing what protection under the Convention Against Torture requires: that the Cheges were more likely than not to be tortured "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

The Cheges' evidence could reasonably be taken to establish that they would be at some risk of ethnically, religiously, or politically motivated violence — including female genital mutilation — at the hands of the Mungiki, and that the Mungiki have sometimes operated at the instigation of or with the consent or acquiescence of Kenyan authorities. But even recognizing such risks of violence, the Cheges' evidence does not *compel the conclusion* that the Cheges are

*more likely than not* to be the victims of violence perpetrated at the instigation of or with the consent or acquiescence of Kenyan authorities.[1]  In actuality, much of the record could be taken to support a contrary notion: that even if the Cheges were to be subjected to violence perpetrated by the Mungiki, it is *unlikely* that such violence would be perpetrated at the instigation of or with the consent or acquiescence of Kenyan authorities.

For instance, the Blunt Declaration indicates that the Mungiki are increasingly operating *independent* of state sponsorship, without suggesting that Kenyan authorities are willfully blind toward their activities:

> However, this last spate of ethnic violence [in 2008] *was largely autonomous from the real machinations of Kenya's political elites* indicating a somewhat disturbing trend of genuine ethnic violence that is *not a side show of Kenya's more official politics*.  Due to profound uncertainty around what authority actually backs ownership of land in the Rift Valley in particular, Kalenjins and Kikuyus have resorted to securing their claims by the mobilization of force on the ground, what Mr. Chege is calling "Kalenjin warriors" and "Mungiki."

A.R. 729 (emphasis added).  The Blunt Declaration largely describes the Mungiki as a sort of gang waging cultural warfare for its own purposes:

> More recently, Mungiki have been raiding churches in Central province, threatening pastors, warning them against trying to recruit children to Christ . . . . Mungiki have also been raiding funerals to force Kikuyu family's [sic] to conduct 'traditional' burial practices rather than those understood to be Christian. This is to suggest that Mungiki's actions, far from being merely economic, are equally about asserting a particular view of what

---

[1] Moreover, one might be hard-pressed to say that the Cheges' evidence *compels the conclusion* that they are *more likely than not* to be subjected to physical violence by the Mungiki at all, regardless of whether it occurs at the instigation of or with the consent or acquiescence of Kenyan authorities.  The Immigration Judge held as much when he denied the Cheges' application of withholding of removal on the merits, and his decision relied extensively on evidence in the record. *See* A.R. 200-03.  But we need not reach this issue because the Cheges have waived their withholding claim, and because we decide their Convention Against Torture claim on the basis of their failure to show that it is more likely than not they will be tortured "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," 8 C.F.R. § 208.18(a)(1).

> correct Kikuyu culture, religion, and politics is and how it should
> be practiced.

A.R. 736. To be sure, the Blunt Declaration describes the Mungiki as having been employed as a paramilitary force by certain Kenyan authorities, and sometimes operating with the acquiescence of authorities. *See id.* But they maintain a substantial independent mission:

> Clearly Mungiki has become muscle for hire, *while also being engaged in their own program of imagined re-traditioning*, a constellation of discourses and practices that many Christian Kikuyus find deeply offensive and repressive.

A.R. 737 (emphasis added).

Blunt's telephonic testimony before the Immigration Judge gave a similarly mixed portrait of the relationship between the Mungiki and Kenyan governmental authorities:

> The political winds change fairly often in Kenya. What you have with Mungiki is a complicated back and forth relationship with the state. Sometimes they're being, you know, literally sacrificed in the streets [by] new regimes, and then when it's politically expedient, trying to bring them back into full new particular types of a privatized force.

A.R. 561.

Blunt, no doubt testifying to the best of his knowledge, made no attempt to quantify how much Mungiki violence was perpetrated at the instigation of or with the consent or acquiescence of public officials. Thus, although he could testify that it was more likely than not that the Mungiki would harm the Cheges, *see, e.g.*, A.R. 335, 339, 569, 574, and that the Mungiki sometimes act at the instigation of or with the consent or acquiescence of public officials, *see, e.g.*, A.R. 561, he could not — and did not — say that the Cheges were more likely than not to be tortured by the Mungiki "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity," 8 C.F.R. §§ 208.16(c)(2), 208.18(a)(1).

Moreover, Andrew and Miriam's testimony before the Immigration Judge never gave any indication that any Kenyan authorities instigated, consented to, or acquiesced to the Mungiki campaigns of violence. *See* A.R. 276-466, 473-542.

As a result, the Board and Immigration Judge evaluated a record devoid of concrete evidence that the Cheges *were more likely than not* to be tortured "at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. §§ 208.16(c)(2), 208.18(a)(1). Thus, their determination that the Cheges did not qualify for protection under the Convention Against Torture was supported by substantial evidence, and no "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Zhao*, 569 F.3d at 247.

### III. Conclusion

For the foregoing reasons, the petition for review is hereby **DENIED**.