NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0644n.06

No. 08-3853

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Sep 17, 2009**
LEONARD GREEN, Clerk

YUE HAE ZHONG,                                )
                                              )
        Petitioner,                           )        ON PETITION FOR REVIEW
                                              )        FROM THE BOARD OF
        v.                                    )        IMMIGRATION APPEALS
                                              )
ERIC H. HOLDER, JR., Attorney General of the  )
United States,                                )
                                              )
        Respondent.                           )
                                              )

BEFORE: SUTTON and GRIFFIN, Circuit Judges, and LIOI, District Judge.[*]

        GRIFFIN, Circuit Judge.

        Yue Hae Zhong, a native and citizen of the People's Republic of China, petitions for review

an order of the Board of Immigration Appeals ("BIA" or "Board") affirming a decision of an

immigration judge ("IJ") denying Zhong's application for asylum, withholding of removal, and

protection under the Convention Against Torture ("CAT").[1]   Because Zhong has failed to

demonstrate a well-founded fear of future persecution or a clear probability of torture because of her

---

[*]The Honorable Sara Lioi, United States District Judge for the Northern District of Ohio,
sitting by designation.

[1]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, 1465 U.N.T.S. 85, G.A. Res. 39/46, U.N. GAOR 39th Sess., Supp. No.
51 at 197, U.N. Doc. A/39/51 (1984); *see also* implementing regulations at 8 C.F.R. § 208.18.

alleged protected status, we conclude that her petition lacks merit. Accordingly, we deny the petition for review.

I.

This unfortunate case reads like a Jacqueline Susann novel. It begins when Yue Hae Zhong met Tony Ma "through some friends" in China. According to Zhong's application for asylum, in 1994, Tony Ma asked Zhong if she wanted to travel to the United States to become the girlfriend of a wealthy American, David Jones. Ma knew a man, Levi Johns, who was willing to pretend to be Zhong's fiancé, allowing her to obtain a visa. Zhong claims that Ma promised her that if she came to America and became Jones's mistress, she would become wealthy and could assist her family to immigrate to the United States.

Zhong accepted Ma's offer which included pre-paid travel to the United States. On July 2, 1995, she arrived and began living with Tony Ma and working in his restaurant. Once a week, David Jones would visit her for sex. This arrangement continued until Jones became ill and could no longer have sexual relations.

In April 1997, Tony Ma informed Zhong that he could no longer employ her because she was an illegal alien. She was subsequently fired.

Thereafter, she moved into the home of Tony Ma's neighbor, "Mrs. Stone." Zhong discussed her situation with Stone and Stone's friend, Jimmy Ng. At some point during this time period, Zhong discovered that she was pregnant. In January 1998, Zhong gave birth to a son, whom she gave up for adoption. According to her application for asylum, Jimmy Ng and his secretary, Lucy

Mitchell, persuaded Zhong that she could remain in the United States and become "rich" if she blackmailed Jones by accusing him of rape. In response to Zhong's allegations, Jones and Ma were indicted for numerous federal offenses, including harboring, conspiracy, and false statements. At trial, Zhong testified that Jones had raped her.

During the trial, Zhong moved into the home of Betty Ward. Ward convinced Zhong to admit that she had offered false testimony against Jones. As a result of Zhong's recantation, the trial judge declared a mistrial. Zhong was charged with perjury. She was convicted of aiding and abetting a false statement, in violation of 18 U.S.C. § 1001 and 18 U.S.C. § 2, and sentenced to one year of probation.

Subsequently, Zhong was served with a Notice to Appear in removal proceedings, alleging that she was removable from the country pursuant to: (1) section 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(B), as an alien who remained in the United States for a time longer than allowed; and (2) section 237(a)(2)(A)(i) of the INA, 8 U.S.C. § 1227(a)(2)(A)(i), as an alien convicted of a crime of moral turpitude.

On August 20, 2003, Zhong filed an application for asylum. In her opening brief in support of asylum, Zhong asserted that she was a "trafficked woman," and she had a well-founded fear of future persecution in China because of her membership in a particular social group, that of trafficked women. At her hearing before the IJ, Zhong offered the expert testimony of Professor Franklin Copper in support of her alleged well-founded fear of persecution.

On December 17, 2003, the IJ denied Zhong's application for asylum, withholding of removal, and protection under CAT. The BIA affirmed, ruling in part that Zhong did not "identify any particular factors which convince[d] [it] that [Zhong] has a well-founded fear of persecution if she returns to China."

Zhong timely petitions for review.

II.

"When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). This court "directly reviews the decision of the IJ while considering the additional comment made by the BIA." *Id.* (internal quotation marks and citation omitted). In addition, "[f]actual findings are reviewed under a substantial evidence standard in which we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole" and are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* at 247 (internal quotation marks and citation omitted).

Asylum may be granted to an alien who qualifies as a "refugee," which is defined as one "who is unable or unwilling to return to . . . [her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. §§ 1158(b)(1), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility" should she be returned to her country of origin. *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal

quotation marks and citation omitted). An applicant is not required to demonstrate that she will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). The applicant's testimony, if deemed credible, may be sufficient to sustain the burden of proof without corroboration. 8 C.F.R. § 1208.13(a).

Even if not entitled to asylum, an alien may secure withholding of removal if she can show that her "life or freedom would be threatened in that country [to which she would be sent] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b). The petitioner must establish a "clear probability of persecution." *INS v. Stevic*, 467 U.S. 407, 413 (1984). To establish a clear probability, the applicant must demonstrate that "it is more likely than not" that she will be persecuted upon her return. 8 C.F.R. § 1208.16(b)(2).

> Unlike an application for asylum, however, a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and it only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country. Furthermore, a greater quantum of proof is required as to the likelihood of persecution in the country of risk in order to establish eligibility for withholding. In other words, the courts consider the same factors to determine eligibility for both asylum and withholding, but in the case of withholding, a higher probability of persecution is required.

*Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).

To be eligible for protection under CAT, the applicant must establish "that it is more likely than not that [ ] she would be tortured if removed to the proposed country of removal." 8 C.F.R. §

1208.16(c)(2); *see Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (defining and discussing "torture"). This court will uphold the BIA's decision concerning withholding and the CAT unless it is manifestly contrary to law. *Castellano-Chacon,* 341 F.3d at 545; 8 U.S.C. § 1252(b)(4)(C). "Thus, the BIA's determination should be upheld unless evidence not only supports a contrary conclusion, but indeed *compels* it." *Zhao*, 569 F.3d at 247 (internal citation and quotations omitted).

III.

The IJ and BIA found that Zhong failed to establish that she "has a well-founded fear of persecution, even if [she] did belong to a recognized social group in China, that of trafficked women," finding that "[w]e are unable to identify any particular factors which convince us that [she] has a well-founded fear of persecution if she returns to China."[2] At her hearing before the IJ, Zhong provided an expert witness on conditions in China, Professor Copper, who testified that if persons in Zhong's village learned about her conduct in the United States, "she would be labeled" or, "much worse, punished by local officials, [an] unofficial kind of punishment and mistreatment, forced into this occupation or that."

The IJ questioned Professor Copper regarding the possible repercussions that would occur in China due to Zhong's criminal conviction:

> Q:     [IJ] She was convicted of aiding and abetting a false statement in court so it's a serious offense but it's not drugs, it's not murder.  Do you really think

---

[2]Because we conclude that Zhong has failed to demonstrate a well-founded fear of future persecution or a clear probability of torture in China, we need not decide whether the IJ and BIA correctly determined that Zhong does not qualify as a "trafficked woman."

there's a significant possibility she would be sent to a labor camp just based on that?

A: [Copper] If someone wanted to manipulate the system and try to see that that happens –

Q: So in other words that would probably only happen if Tony Ma happened to have contacts?

A: Probably the chance of it is, well, it's less than 50-50 if someone didn't intervene. The problem is that what would happen is the record would go back to China and some official may just simply put down criminal and not say what the crime was.

Q: And do you think that anyone who's just labeled a . . .[criminal]

Q: Right.

A. – do this.

Q: Have there been any studies of people deported from the United States and what happens to them in China?

A: Not that I know of. Individual cases, that's all. Some of them have gone back thinking that they would be well-received and they go to jail. Others go back and nothing, nothing at all happens. I know of people that have gone back and had problems and some who haven't.

Professor Copper also testified regarding *how* Zhong's criminal status might come to the attention of village officials:

Q: [Zhong's counsel] [D]id you think when you were talking about whether . . . the likelihood of her risk, if Tony were not in the picture . . . the question is the fact that her family has fallen out of grace with the local government, does that have any bearing on it?

A: It could. Certainly in the sense of her family having any influence with the local officials to help her, that means they wouldn't. China not being a country of laws and a country where people, where everything happens to an

> individual with connections, if she has somebody to help her then that's a plus. If she doesn't, if the family's poor and if local officials don't like her parents, then she's going to suffer from that.

Q:  Well, Tony Ma is Chinese and he's the one who's her, you know, he's been convicted of several felonies because of her so, you know, what is the likelihood that he's just going to forget about this?

A:  Well –

Q:  I know you don't know him.

* * *

A:  All I can say is that it is very easy for him to contact someone in the village and cause problems. Whether he would do that, I don't know.

In *Bastanipour v. I.N.S.*, 980 F.2d 1129, 1132 (7th Cir. 1992), the Seventh Circuit held that drug traffickers do not constitute a "particular social group" for purposes of the INA. For the same reasons that drug traffickers do not constitute a "particular social group," neither do perjurers. Zhong offers no tenable reason why we should not embrace this conclusion. *See United States v. Aranda-Hernandez*, 95 F.3d 977, 980-81 (10th Cir. 1996) (holding that the theory that "informants for drug enforcement agencies" could constitute a "particular social group" "is not supported by the principles underlying" the INA).

Based on the testimony presented before the IJ, Zhong has shown that she might be persecuted or, more precisely, punished, because of her criminal record. Professor Copper's testimony, however, does not support the assertion that village officials would persecute Zhong because she was arguably a trafficked woman, or because she was involved in prostitution-like activity in the United States. Even if we were to presume that China would punish her in a harsher

manner because of her criminal record, such as assigning her to a labor camp, this conclusion is insufficient to demonstrate a well-founded fear of persecution based upon her membership in a protected group. The record evidence only supports the proposition that she might encounter persecution because she is a convicted criminal. As we stated in *Castellano-Chacon,* "society's reaction to a 'group' may provide evidence in a specific case that a particular group exists, as long as the *reaction by persecutors to members of a particular social group is not the touchstone defining the group.*" 341 F.3d at 548 (emphasis added). Professor Copper's testimony, in large part, speaks only to the reaction of local officials and villagers to her criminal record. Moreover, Professor Copper did not testify that Chinese labor camp conditions were tantamount to torture, or that she would encounter torture while at the camp.

The IJ also took testimony from Zhong regarding who might threaten her, who threatened her in the past, and the likelihood of threats happening to her in the future. On cross-examination, Zhong testified that she feared Tony Ma and David Jones.

> Q:     [Counsel for Government] Those are the only two people that you fear?
>
> A:     [Zhong] These two are whom I know they could hurt me but I don't know any other people.
>
> * * *
>
> Q:     Where are David Jones and Tony Ma right now?
>
> A:     I don't know exactly but I saw David Jones a couple of times in the parking lot of Wal-Mart and one time when I was loading the grocery that I purchased to my car, he stop his car, lean on my car and stare at me.
>
> Q:     So it was David Jones that was following you at Wal-Mart?

A:     It was David Jones but I don't know whether he was following me or not but he saw me and I saw him.

Q:     Did he say anything to you?

A:     He parked his car near my car and he stared at me and he didn't say anything.

Q:     Okay.  Has Mr. Jones threatened you since the trial?

A:     No.

Q:     This incident at Wal-Mart, you said you don't know if he was there following you?  You don't know that?

A:     I didn't know.

Q:     All right.  And you don't know where Tony Ma is?

A:     I don't know.

Q:     You've had no contact with him at all?

A:     No.

Following cross-examination, the IJ asked Zhong about threats made against her and her family by Tony Ma:

Q:     [IJ] Since you testified against him, has he made any threats either to you or your family?

A:     I am not sure whether it is Tony Ma or his wife Mary Ma [that] call Mary Ma's family back in China and through one of the common friends, this friend told my parents that I was in trouble here in America.

Q:     Well, was any threat made to your parents to harm them or a threat of harm to you?

A:     No.  I don't know.

Q:      All right.  Well, why do you think Tony Ma would harm you if you went back to China?

A:      Because I believe that David Jones has money and they will either make phone calls or spend money in China and find a way to hurt me if I go back.

Based on the preceding testimony, the IJ ruled that Zhong failed to establish a well-founded fear of persecution because the threat to her was speculative.  Specifically, he found that the threat was dependant on Ma's contacts, and on Ma wishing to exact revenge on Zhong, both of which were not clearly established during the hearing.  In so ruling, the IJ stated "so that even if something bad might happen to her in China, and that is fairly speculative, that it would not be on account of race, religion, nationality, or membership in a particular social group or political opinion." *See Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) (holding that an asylum applicant "cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution.") (internal quotation marks and citation omitted).

While Zhong established that she may encounter problems in China because she testified against David Jones and Tony Ma during their criminal trial, she did not establish that she has a well-founded fear of persecution on account of her membership in a particular social group or one of the remaining four categories under § 241(b)(3)(B) of the INA.  Simply put, Zhong fears retribution for her fabricated testimony, not persecution based on a protected characteristic under the INA.  Zhong did establish that Tony Ma could reach people in China to discuss her behavior, but even when this occurred, he only informed members of *his* family that Zhong was "in trouble in America."

According to Zhong's testimony, Tony Ma also made a phone call to an uncle of his wife in Guangxhou, China, because he was trying to find out where Zhong lived. Zhong testified that "they" threatened to harm her and her parents, but she failed to meet her burden of proof that this threat was motivated by her membership in a particular social group.

Based on the above-quoted testimony, we uphold the IJ's and BIA's determinations that Zhong has not carried her burden of proof for asylum under § 208 of the INA, 8 U.S.C. § 1158(a), which requires her to demonstrate a well-founded fear of future persecution in China based on her alleged membership in a particular social group. *Cardoza-Fonseca*, 480 U.S. at 428. Moreover, because her burden of proof is greater when seeking withholding of removal under § 241(b)(3)(B) of the INA, 8 C.F.R. § 1208.16(b), this claim fails as well. The IJ's and BIA's decisions, "considered as a whole," are "supported by reasonable, substantial and probative evidence" and do not compel a contrary conclusion. *See Zhao*, 569 F.3d at 247.

In addition, we reject Zhong's claim that she and her family have suffered past persecution. Zhong argues that "[h]er family in China has been threatened with harm if they did not reveal to Mr. Ma the present location of Ms. Zhong." We have held that to demonstrate persecution "the conduct on which the application for asylum is based must go beyond what might reasonably be characterized as mere harassment . . ." *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005). Moreover, "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390

(6th Cir. 1998). At most, Zhong and her family have received threats from David Jones and Tony Ma. Threats alone, however, are insufficient to establish past persecution.

IV.

An applicant seeking relief under the CAT has the burden of proving that it is more likely than not that she will be tortured if removed to the proposed country. 8 C.F.R. § 208.16(c)(2). Unlike claims of asylum and withholding of removal, an applicant need not show torture on one of the five statutory grounds; rather,

> [t]orture is defined as any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). In deciding whether torture is more likely than not to occur upon the applicant's return to the country, we "consider the possibility of future torture, including any evidence of past torture inflicted upon the applicant and evidence that the applicant is not likely to be tortured in another area of the country of removal." *Ali*, 237 F.3d at 596-97; *see also* 8 C.F.R. § 208.16(c)(3).

Zhong bases her CAT claim on the same ground as her requests for asylum and withholding of removal. Just as she fails to demonstrate that persecution is more likely than not, she likewise fails to demonstrate that torture is more likely than not. We therefore deny her request for relief under the Convention Against Torture. *See Berri v. Gonzales*, 468 F.3d 390, 397-98 (6th Cir. 2006).

V.

For these reasons, we deny the petition for review.