**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0671n.06

No. 09-3895

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Nov 02, 2010
LEONARD GREEN, Clerk

OLGA SHIPILOVA,                                    )
                                                   )
        Petitioner,                                )        ON PETITION FOR REVIEW
                                                   )        FROM THE BOARD OF
        v.                                         )        IMMIGRATION APPEALS
                                                   )
ERIC H. HOLDER, JR., Attorney General of the       )
United States,                                     )
                                                   )
        Respondent.                                )
                                                   )

BEFORE: GILMAN and GRIFFIN, Circuit Judges; and ROSE, District Judge.[*]

        GRIFFIN, Circuit Judge.

        Olga Shipilova, a native and citizen of Russia, petitions for review of an order of the Board

of Immigration Appeals ("BIA" or "Board") affirming an immigration judge's ("IJ") denial of her

application for asylum, withholding of removal, and protection under the Convention Against

Torture ("CAT").[1] Shipilova argues that the BIA erred by adopting and affirming: (1) the IJ's

finding that she was not credible; and (2) the IJ's finding that her asylum claim was insufficiently

corroborated. Because each of these arguments lack merit, we deny the petition for review.

---

[*]The Honorable Thomas M. Rose, United States District Judge for the Southern District of
Ohio, sitting by designation.

[1]United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading
Treatment or Punishment, 1465 U.N.T.S. 85, G.A. Res. 39/46, U.N. GAOR 39th Sess., Supp. No.
51 at 197, U.N. Doc. A/39/51 (1984); *see also* implementing regulations at 8 C.F.R. § 208.18.

I.

Shipilova entered the United States on July 2, 2002, as an exchange visitor with authorization to remain in the country for a temporary period not to exceed October 10, 2002. On February 24, 2003, Shipilova applied for asylum, withholding of removal, and protection under the CAT. The government subsequently served Shipilova with a notice to appear ("NTA"), charging her with removability under § 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States beyond October 10, 2002, without authorization.

In her asylum application, Shipilova asserted that she would be subject to persecution because of her Baptist religion if she returned to Russia. She explained that, after she "started attending [religious] services[,]" she was involved in "numerous conflicts and was beaten up a number of times due to [her] religious [adherence]" by "Russian pro-fascists, Cossac[k]s – special para-military group of population that persecute everyone who is not Orthodox and fanatics of the Orthodox Christian Denomination . . . ." Moreover, Shipilova indicated that "persecutions of our religion is traditional in Russia" and that "there is no hope that it will be stopped and the government does nothing to stop it."

Shipilova also included a personal statement with her asylum application further describing her background. She explained that like "most Soviets" she was raised an atheist. However, after her father died, she became depressed and "became close" to her paternal grandparents who introduced her to the Baptist faith. Shipilova indicated that she formally joined the Baptist congregation in October 2000.

Moreover, Shipilova recounted five incidents of religious persecution that she allegedly experienced while in Russia:

On November 5, 2001 I was attacked while professing [the] word of G-d in the streets of Krasnodar. I was approached by Cossacks, the paramilitary mighty organization based exactly in the area where I lived in Russia. They took all the literature and beat me up by their traditional weapon: whips. I went to the local police and tried to file a report but [was] rejected by the police officer who told [me] that police could do nothing to prevent Baptists from the attacks or punish the attackers because the Cossacks are very powerful and [the] police [have] no strength to fight them.

On June 1, [2001] I was [on] the bus and started talking about G-d with another woman. Skinheads who were [on] the bus . . . overheard what we were talking about. The woman I talked to and I were beaten up and thrown outside by skinheads. We went to the nearest police office and were told that [the] police would not [be] able to help us.

On September 9, 2001 I was in the village where my grandparents live and went to the church with them. We were stoned while leaving the church. The attackers were skinheads and the other villagers were supporting them. I and [a] few other young church attendants ran to the local police office. The officer told us that he could not help because he is alone. My grandparents complained to the higher authorities but were told that it was useless to complain because the religion is considered non-traditional for Russia.

On February 12, 2002 I was beaten up while distributing literature on the bus stop. I was approached by [a] police officer who confiscated the literature in spite [of] the fact that our church had permission to stay at the place. When I told the officers that I was legally distributing the literature there I was beaten up. I complained to the pastor and he contacted authorities but the chief of police told [him] that [the] officer[s] who are responsible for the area know better what to do and he did not care about permits. The pastor called [a] lawyer but [the] lawyer told [him] that it was practically impossible to bring police to [] justice.

On March 4, 2000 I was attacked in the country with [my] sister in Christ . . . . This is the most terrifying incident I had and it is extremely difficult for me to write. . . . Her and me were attacked by skinheads and extremely abused. We were saved by the people who lived [] there and who took us from the trees.

On March 20, 2003, an asylum officer interviewed Shipilova regarding her asylum claim. At that interview, she was accompanied by an interpreter that she found through a friend. The interview was not recorded or transcribed, but the asylum officer prepared a summary of the meeting.[2] In his summary, the asylum officer stated that he had "serious doubts" as to Shipilova's credibility. Specifically, he noted that:

> The applicant could not provide consistent, detailed information about [her] overall claim. She was internally inconsistent and inconsistent with her affidavit in that she testified that it was her father's death in 1999 that prompted her to join the Baptist Church upon her return from her grandparent's home in October 1999. She, however, also testified that it was in October 2000 when she joined the church. When asked to clarify the inconsistency, she indicated that it could have merely been a mistake. Her response is not seen as reasonable in that she clearly indicated that it was her father's death in 1999 that so affected her and caused her to join the church immediately following her return from her grandparents. However, she clearly indicates in her affidavit that she joined the church in 2000. This inconsistency is seen as material as it sets the tone for her overall claim of being a Baptist and thus suffering harm because of her religion.

In addition, the asylum officer found that Shipilova's testimony regarding her five incidents of alleged religious persecution was not detailed and instead seemed "rushed." When asked to clarify or add detail, Shipilova "would repeatedly say, 'all Baptists are treated with such contempt.'" Indeed, when asked to provide even basic details, like the name of her church, the asylum officer noted that Shipilova "struggled" and that her responses were "again . . . lacking in consistent detail to be deemed credible."

---

[2]The record also contains the asylum officer's handwritten notes of that meeting. Importantly, those notes indicate that Shipilova stated that her father died in 1999 and that the incident in which she was tied to a tree occurred in March 2002.

The asylum officer further found Shipilova's "testimony about her time with the church" to be "not credible in that she did not provide logical, consistent, and detailed testimony." He thought it "logically inconsistent" that Shipilova, "as a newcomer to the faith, would be tasked with 'recruiting' people only weeks after [she was] baptized" and noted that Shipilova was unable to explain how this was possible. Due to his credibility findings, the asylum officer concluded that Shipilova had failed to meet her burden of establishing eligibility for asylum.

On February 27, 2007, Shipilova submitted an updated, unsigned personal statement, which largely recapped the incidents in her first statement, while adding new details, but omitting dates concerning those incidents. In her updated statement, she indicated that she joined the Baptist congregation in October 2001, rather than in October 2000, as indicated in her original personal statement. Shipilova also recounted a time when the dean of her university called her to his office to reprimand her for talking about God, and then deprived her of her monthly allowance as punishment. Furthermore, Shipilova indicated that a girl who used to be her friend refused to talk to her because she was a Baptist and spit in her face.

At her removal hearing, Shipilova testified that she came to the United States because she wanted to express her belief in her faith. Shipilova indicated that she joined the Russian Baptist church in October 2001 when she was twenty-two. She first stated that she was baptized in "2002," and then said, "I apologize I was baptized in May 11, 2003[.]" When asked again on what date she was baptized, Shipilova responded that she was baptized on "May 11, 2001[,]" and then confirmed it actually occurred on "May 11, 2002[.]"

The government's attorney asked Shipilova several questions, beginning with what year her father died. Shipilova responded that he died on August 18, 1998, when she would have been eighteen years old.[3] When asked why she told the asylum officer that her father died in August of 1999, Shipilova stated that she did not have a professional interpreter at the time of the interview, but instead brought an interpreter based on a friend's recommendation and that she was not confident in his translation abilities. Next, Shipilova reconfirmed that she joined the Baptist church in October 2001. She said that her original personal statement indicated she joined in October 2000 because she was thinking of joining then and attended church "sometimes."

Shipilova was unable to provide dates or supporting documents for the majority of the incidents of harassment she reported in her asylum application. When asked to recount the first incident that happened to her, Shipilova stated that "I'm not very confident about dates because it was a long time ago . . . ." Shipilova was also asked to provide the date of the incident in which she claims she was harassed by a police officer at a bus stop, to which she replied, "[i]t's been so many times because it's not only one day." When asked if she remembered what year the incident occurred, she stated that she was "not confident [of] the dates because I have a lot of examples and cases and it's very harmful and very stressful . . . ." With regard to the incident where Shipilova was tied to a tree, Shipilova indicated that it happened in April or May of 2000, which would have been before she joined the church in October of 2001 or even thought of joining the church in October of

---

[3]Shipilova was born on September 17, 1979.

2000. Finally, Shipilova testified that she went to the doctor "after each incident" but that they did not give her medical reports that she could provide to the court.[4]

On March 28, 2007, the IJ denied Shipilova's request for asylum, withholding of removal, and protection under the CAT. The IJ found that Shipilova was not credible due to her "inconsistent and vague" testimony regarding the date her father died, the date she became a Baptist, and several of the incidents in which she was allegedly persecuted for her Baptist beliefs. The IJ also opined that Shipilova's demeanor was unconvincing in light of her "non-responsive" testimony, which revealed evidentiary gaps further undermining her credibility. In addition, the IJ found that Shipilova lacked corroboration for her claims. On July 2, 2009, the Board affirmed the IJ's denial of Shipilova's request for relief.[5]

Shipilova timely petitions for review.

---

[4]However, Shipilova also testified that she did not receive medical treatment for her back injury after the church stoning incident. It is possible that she *sought* treatment, but did not *receive* treatment.

[5]The Board also noted that, on appeal, Shipilova submitted several new documents, including an extract of her medical records from a hospital in Russia, letters from her pastor and fellow church members in this country, a psychological report, and country conditions for Russia. The Board explained that it considered the additional evidence submitted on appeal only as a possible basis for remand because the Board is an appellate body whose function is to review, not to create, a record. It then concluded that the evidence was not sufficient to show that Shipilova had made a prima facie case for the relief requested. In so doing, the Board noted that Shipilova failed to explain why her recently submitted evidence could not have been produced at the time of her hearing before the IJ.

II.

"When the BIA adopts the IJ's reasoning and supplements the IJ's opinion, that opinion, as supplemented by the BIA, becomes the basis for review." *Zhao v. Holder*, 569 F.3d 238, 246 (6th Cir. 2009). We "directly review[] the decision of the IJ while considering the additional comment made by the BIA." *Id.* (internal quotation marks and citation omitted).

We review questions of law de novo and factual findings under the substantial evidence standard. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "Factual findings are reviewed under a substantial evidence standard in which we uphold a BIA determination as long as it is supported by reasonable, substantial, and probative evidence on the record considered as a whole" and are "conclusive" unless "any reasonable adjudicator would be compelled to conclude to the contrary[.]" *Zhao*, 569 F.3d at 247 (internal quotation marks and citation omitted).

Asylum may be granted to an alien who qualifies as a "refugee," a term defined as one "who is unable or unwilling to return to . . . [her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A). An applicant for asylum bears the burden of demonstrating that "persecution is a reasonable possibility" if she returned to her country of origin. *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (internal quotation marks and citation omitted). An applicant is not required to demonstrate that she will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421,

431 (1987). The applicant's testimony, if deemed credible, may be sufficient to sustain her burden of proof without corroboration. 8 C.F.R. § 1208.13(a).

Even if not entitled to asylum, an alien may secure withholding of removal if she can show that her "life or freedom would be threatened in that country [to which she would be sent] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *accord* 8 C.F.R. § 208.16(b). The petitioner must establish a "clear probability of persecution[.]" *INS v. Stevic*, 467 U.S. 407, 413 (1984). To meet this standard, the applicant must demonstrate that "it is more likely than not" she will be persecuted upon her return. 8 C.F.R. § 1208.16(b)(2).

> Unlike an application for asylum, however, a grant of an alien's application for withholding is not a basis for adjustment to legal permanent resident status, family members are not granted derivative status, and it only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country. Furthermore, a greater quantum of proof is required as to the likelihood of persecution in the country of risk in order to establish eligibility for withholding. In other words, the courts consider the same factors to determine eligibility for both asylum and withholding, but in the case of withholding, a higher probability of persecution is required.

*Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).

To be eligible for CAT protection, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2); *see Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001) (defining and discussing "torture"). We will uphold the BIA's decision concerning CAT protection unless it is "manifestly contrary to the law[.]" *Ali*, 237 F.3d at 596 (internal quotation marks and citation omitted). "Thus, the BIA's

determination should be upheld unless evidence not only supports a contrary conclusion, but indeed

*compels* it." *Zhao*, 569 F.3d at 247 (internal quotation marks and citation omitted).

III.

Shipilova argues that none of the alleged inconsistencies relied on by the BIA and IJ could

be viewed as attempts to enhance her claims of persecution and many should be seen merely as

difficulties in remembering the exact dates of events that occurred years ago. Moreover, Shipilova

contends that the BIA and IJ erred in relying on the unverified notes of the asylum officer in

assessing her credibility.[6] Finally, Shipilova argues that the BIA and IJ erred in finding that her

---

[6]As an initial matter, the BIA did not err in affirming the IJ's adverse credibility determination, which was based in part on the record of the asylum interview. The Second Circuit accurately described the BIA's standards in this regard when it stated:

> While the record of an asylum interview is more reliable when it describes the specific questions asked or records the interview verbatim, an interview record even without such assurances of reliability nevertheless meets the minimum standard, and it may be relied on as a basis for an adverse credibility determination as long as it contains a "meaningful, clear, and reliable summary of the statements made by [the applicant] at the interview." *See Maladho Djehe Diallo v. Gonzales*, 445 F.3d 624, 631-33 (2d Cir. 2006) (quoting *Matter of S-S-*, 21 I. & N. Dec. 121 (BIA 1995)) (internal quotations omitted).

*Kangyi Wen v. Holder*, 343 F. App'x 650, 651 (2d Cir. 2009) (unpublished).

We have reviewed the asylum officer's assessment and the handwritten notes appended to it. The assessment memorandum is typed and summarizes the interview and the asylum officer's findings, including his conclusion that Shipilova was not credible. The handwritten notes appear to track a question and answer format. Thus, it was not error for the IJ to consider these notes and determine that Shipilova was not credible because her personal statements and subsequent testimony were inconsistent with her interview with the asylum officer.

asylum claim was insufficiently corroborated. We disagree and affirm the BIA's denial of Shipilova's application for asylum, withholding of removal, and protection under the CAT.

"[T]he IJ's determination of [Shipilova's] credibility is reviewed under the highly deferential substantial evidence standard, and is reversed only if any reasonable adjudicator would be *compelled* to conclude to the contrary." *Bah v. Gonzales*, 462 F.3d 637, 640 (6th Cir. 2006) (citation and internal quotation marks omitted). Because Shipilova's asylum application preceded the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, the IJ's adverse credibility determination "'must be supported by specific reasons [and] . . . must be based on issues that go to the heart of the applicant's claim.'"[7] *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)). Discrepancies have no bearing on an applicant's credibility unless they serve to enhance the applicant's claim of persecution. *Sylla*, 388 F.3d at 926. Speculation and conjecture provide inadequate bases for an adverse credibility determination, which must instead be supported by substantial evidence. *Liti*, 411 F.3d at 637.

In the present case, both the IJ and BIA chronicled numerous discrepancies in the evidence. Specifically, they noted that Shipilova was inconsistent as to: (1) when her father died; (2) when she subsequently joined a Baptist church in Russia; (3) when her literature was taken, and she was beaten and cursed at while professing the word of God in the streets; (4) when her first encounter with Cossacks occurred; (5) when skinheads assaulted her on a bus for discussing her religion with a

---

[7]The REAL ID Act modified the standard governing credibility determinations and now provides that such findings should be "based on the 'totality of the circumstances' and take into account 'all relevant factors.'" *El-Moussa v. Holder*, 569 F.3d 250, 256 (6th Cir. 2009) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)).

fellow passenger and pushed them out of the bus resulting in bruises all over her body; (6) when and how many times a police officer confiscated the religious materials that she was distributing at a bus stop and beat her; (7) when she and her grandparents were stoned by skinheads as they were leaving church; (8) whether she sought any medical treatment for her injured back; and (9) when she was tied to a tree.

These several examples go to the heart of Shipilova's claim and demonstrate the numerous inconsistencies between Shipilova's testimony, asylum interview, and written statements. *See Singh v. Ashcroft*, 398 F.3d 396, 402-03 (6th Cir. 2005) (concluding that adverse credibility finding was supported by key inconsistencies between an asylum application and alien's testimony where IJ rejected alien's explanation for inconsistencies); *Kaba v. Mukasey*, 546 F.3d 741, 749-50 (6th Cir. 2008) (stating that the complete lack of specificity in an application justifies the IJ's skepticism about the validity of those claims). "Undoubtedly, these are the kinds of traumatic events that an individual may forget the exact details of; at the same time, however, these are significant and likely memorable events. Such a wide discrepancy in testimony . . . demonstrates that there was substantial evidence supporting the IJ's adverse credibility finding."[8] *Berri v. Gonzales*, 468 F.3d 390, 395 (6th Cir. 2006). Because the IJ was not unreasonable in finding that Shipilova failed to explain adequately the apparent inconsistencies in her testimony regarding events central to her claim of past

---

[8]Moreover, the IJ properly found that Shipilova's demeanor was not convincing. Here, contrary to Shipilova's assertions, the IJ specifically explained that Shipilova's testimony was at times non-responsive to the question asked and that she occasionally had great difficulty answering. "The IJ is in the best position to determine credibility based on the demeanor of the witness and the presentation of testimony." *See Diallo v. Holder*, 312 F. App'x 790, 801 (6th Cir. 2009) (unpublished).

persecution, we cannot say that, based on the record before us, any reasonable adjudicator would be required to find her credible.

Given the IJ's finding that Shipilova was not credible, he properly determined that Shipilova was obligated to prove her claims with objective corroboration. *See In re Dass*, 20 I. & N. Dec. 120, 125-26 (BIA 1989). "Where the alien's testimony could be viewed as incredible, inconsistent, or incoherent, a fact-finder may reasonably conclude, absent corroboration, that the testimony is insufficient to meet the standard of proof required." *Sako v. Gonzales*, 434 F.3d 857, 862 (6th Cir. 2006) (citation omitted). Indeed, we have held that, even if an applicant's credibility is not in question, the failure to provide reasonably available corroborating evidence "can lead to a finding that an applicant has failed to meet her burden of proof."[9] *Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004) (internal quotation marks and citation omitted); *see also Shkabari v. Gonzales*, 427 F.3d 324, 331 (6th Cir. 2005) (holding that applicant failed to meet refugee burden where record included evidence that she could have obtained documents confirming her hospital visit after allegedly being beaten by police, or other medical evidence, but failed to do so).

Here, the IJ was correct to find that the absence of an affidavit or certificate of membership from any congregant of the Baptist church in Russia or from the church itself further undermined Shipilova's credibility. Her church membership goes to the heart of her claim for asylum based on

---

[9]Shipilova argues that the BIA erred because it "never stated why Ms. Shipilova's explanations for her lack of corroboration from her acquaintances and grandmother were insufficient." We have not "adopt[ed] a requirement that the Immigration Judge [or BIA] specifically address on the record why an applicant's explanation is insufficient, and [Shipilova] points this court to no published Sixth Circuit case law that does." *Fisenko v. Holder*, 336 F. App'x 504, 511 (6th Cir. 2009) (unpublished).

a fear of religious persecution. Moreover, the IJ properly found it significant that Shipilova failed to provide: (1) any corroboration from the attorney her pastor in Russia allegedly called for advice; (2) a police report or other evidence of her complaints; (3) any medical corroboration for her alleged injuries; (4) a letter from her paternal grandmother who taught her about the Baptist religion; (5) a letter from her brother, or mother, with whom she had spoken two weeks prior to her hearing; (6) copies of any religious literature she disseminated in Russia; or (7) a friend from her church in the United States as a witness at her hearing.

In sum, Shipilova's testimony was inconsistent regarding several significant matters that go to the heart of her claim, which would tend to enhance her claims of persecution. Furthermore, Shipilova proffered insufficient corroboration to demonstrate persecution given that her testimony was not credible. Therefore, "[b]ased on the administrative record, a reasonable adjudicator would not be compelled to find [Shipilova] credible." *Pilica v. Ashcroft*, 388 F.3d 941, 952 (6th Cir. 2004). Accordingly, Shipilova did not sustain her burden of proving she is entitled to asylum.

"Because an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." *Singh*, 398 F.3d at 401. Shipilova's application for withholding of removal is accordingly foreclosed, as is her request for protection under the CAT. *See Hamida v. Gonzales*, 478 F.3d 734, 741-42 (6th Cir. 2007).

IV.

For these reasons, we deny the petition for review.